AFFIRM; Opinion Filed October 24, 2012.



In The

## Court of Appeals
## Fifth District of Texas at Dallas

No. 05-11-00965-CR

**SHAKEIDRIA DIANE SMITH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 363rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1000726-W**

# OPINION

Before Justices Bridges, Francis, and Lang
Opinion By Justice Lang

Appellant Shakeidria Diane Smith pleaded not guilty to the offense of aggravated assault with a deadly weapon resulting in serious bodily injury to a person with whom she had a dating relationship. *See* TEX. PENAL CODE ANN. § 22.02(b)(1) (West 2011); *see also* TEX. FAM. CODE ANN. § 71.0021(b) (West Supp. 2012) (defining "dating relationship"). Additionally, appellant pleaded not true to one enhancement paragraph. A jury convicted appellant of the lesser included offense of aggravated assault with a deadly weapon and found the enhancement paragraph true. Punishment was assessed by the jury at fourteen years' imprisonment.

On appeal, appellant asserts nine issues. She contends the trial court erred by (1) not allowing her full and fair cross-examination of the complainant; (2) allowing the State to cross-

examine a witness on an issue on "re-cross," but not allowing appellant to conduct "re-direct" examination on that same issue; (3) allowing into evidence statements made by appellant during a pretrial examination of appellant's competency; (4) refusing to instruct the jury on mistake of fact; (5) allowing the State to present evidence of extraneous offenses during the punishment phase of trial without conducting a preliminary hearing to determine whether the State could prove such offenses beyond a reasonable doubt; (6) admitting into evidence appellant's "jail book-in card"; (7) denying appellant's motion for mistrial when the State "intentionally elicited from a witness an inflammatory inadmissible hearsay statement of appellant's father"; and (8) excluding appellant's testimony regarding prior unlawful sexual contact between the complainant and appellant. Further, appellant asserts the cumulative effect of the trial court's errors denied her a fair trial. We decide against appellant on her nine issues. The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

During the guilt/innocence phase of trial, the complainant, James Jeffries, testified he is thirty-three years old. He stated he has never been married and has no children. He met appellant fourteen years ago. Jeffries testified he and appellant began dating about two months before the incident that gave rise to the charged offense. According to Jeffries, during the time they were dating, he and appellant saw each other almost every day, talked on the phone often, and would frequently "[t]ell each other we love each other."

Jeffries stated that on June 23, 2009, he was outside near his house when he saw appellant's father, Keith Smith. Jeffries was aware that appellant and her grandmother were looking for Smith, and he informed Smith of that. Smith gave Jeffries the keys to the vehicle he was driving, a "Montero," so Jeffries could go pick up appellant and bring her to Jeffries's house while Smith rested there. Jeffries testified he picked up appellant at her aunt's house, where she was staying, and drove her to his house in the Montero. Jeffries stated he gave appellant the keys to the Montero and

–2–

appellant spoke with her father for five to ten minutes. Then, Jeffries, appellant, and another man ran an errand in a different vehicle.

Jeffries testified that when they returned to his house after the errand, appellant "was steady arguing" and said she was tired. According to Jeffries, appellant told him, "I'm not messing with you no more. I ain't fooling with you no more." Jeffries testified appellant walked to the Montero, which was parked behind a truck on the side of the street in front of his house. There was no vehicle parked behind the Montero. Jeffries testified he approached the front driver's side window of the Montero and asked appellant to return the ten dollars he had given her earlier for gas. At that point, appellant was sitting in the driver's seat of the Montero and her father was in the front passenger seat. The driver's side window was open. Jeffries testified he tried to stick his hand "in the door" and appellant took off her shoe and tried to hit him with it. Then, appellant threw ten dollars out of the window. Jeffries stated he picked up the money and started to walk around the front of the Montero to go into the house. He testified that as he walked between the Montero and the truck that was parked in front of it, appellant "put the car in drive" and "bumped" him. He stated he was "really upset" and "looked at her like what the hell wrong with you." Then, Jeffries testified, appellant "smashed the gas" and "pinned" him to the truck. According to Jeffries, appellant had "like an evil look on her face." Jeffries testified he could hear the "steady spinning" of the tires and saw appellant "standing on the gas." He stated he was in so much pain he "barely couldn't stand it" and was screaming. He did not know how long he was pinned between the Montero and the truck. At some point, the Montero backed up and Jeffries fell to the ground.

Jeffries testified he began "blacking out" after he fell. There were "a lot of people" around him. An ambulance arrived and he was taken to the hospital, where he remained for approximately two and one-half months. Jeffries stated he had a "busted artery," a crushed femur bone, and torn muscles in his right leg. He has had fourteen surgeries as a result of his injuries, with more surgery

–3–

pending. He testified he now requires a wheelchair to get around.

Jeffries stated he did not notice any mechanical problems with the Montero when he drove it to pick up appellant on the date of the incident in question. He testified the Montero is an "automatic," and the "gear shift changer" is located on a console between the front driver's seat and the front passenger seat. He stated that to change gears in the Montero, a driver must push in a button while moving the gear shift changer and must have a foot on the brake. Further, Jeffries testified the Montero was moving uphill when he was pinned against the truck.

On cross-examination by the defense, Jeffries testified he is on probation for a first-degree felony offense that involved dealing drugs. Additionally, Jeffries testified he lied when he stated he has never been married. He testified he is currently legally married. Then, the following exchange occurred:

> Q. Now, you also told the jury—and I believe this was in the first few minutes of your testimony right after you were sworn in to tell the truth—that you don't have any children, and that's also not—that's also a lie, isn't it?
>
> A. I don't have no kids.
>
> Q. Why would you tell your probation officer on at least a dozen times that you have children?
>
> A. I have—I have a girlfriend—I have a girlfriend that have kids, and I told them about that. And I also told them that I'm going through—I'm going through a DNA test because I do have—I have—I have—I think I have a child out there. I'm trying to do a DNA test. I told them about that, also.
>
> Q. Okay. Yeah, I mean, you told the probation people, because you're on probation, you told them that?
>
> A. Yes.
>
> Q. Sir, just let me finish, please, and I'll let you respond, okay? You told the probation officer on at least five or six times that you had children?
>
> [STATE]: Objection to improper impeachment and immaterial fact, Your Honor.
>
> THE COURT: Sustained.

Q. [by defense counsel] Were you just lying to the probation officer about that?

A. No.

[STATE]: Object to hearsay, Your Honor.

THE COURT: Sustained.

Later, during a break in Jeffries's testimony, outside the presence of the jury, defense counsel stated as follows:

> Your Honor, we would like to, in terms of impeachment questions—ask Mr. Jeffries—Mr. Jeffries testified in direct examination—very beginning that he was never—has never been married and he has no children. We would like to specifically ask him individual questions about the numerous times that he has reported to psychologists, to probation officers throughout his probationary period that he has children. We would like to specifically ask the question of this witness, so that we could then bring in these records—these probation records to impeach him. Specifically, we would like to ask the question that he reported on—let's see, he reported that he had four children—reported having four children on—in 2008, that specifically that he told the psychologist in an assessment that he was married and while married had an affair with two women that produced two different children and that there was a third child that he was contesting the DNA on. We would like to be able to ask those questions in front of the jury.

The trial court denied that request and the jury returned to the courtroom.

Latasha Moore testified she is a certified peace officer with the Dallas Police Department. She stated that on the date in question, she was dispatched to the scene of the incident described above, where she conducted an investigation. Then, she returned to police headquarters, where she spoke with appellant's father. Moore testified as follows respecting her encounter with appellant's father:

Q. Can you describe how his demeanor was?

A. He was upset. He was very upset.

Q. And did he appear to be upset—do you know who he was upset at or what he was upset about?

A. He was upset with his daughter.

[DEFENSE COUNSEL]: We would object to—this is asking for hearsay.

THE COURT: Sustained.

[DEFENSE COUNSEL]: We would request an instruction to disregard to the jury.

THE COURT: Jury will disregard.

[DEFENSE COUNSEL]: Make a motion for mistrial.

THE COURT: Denied.

Q. [by State] Without going into what he said, did he make any statements to you?

A. Yes.

Q. And were those statements regarding what he was upset about?

A. Yes.

The State rested its case.[1]

Immediately prior to appellant's testimony, outside the presence of the jury, defense counsel stated

> Your Honor, a couple of things in terms of parameters here. The—the State has alleged that there was either a family relationship or a—or a dating relationship, and we are disputing—we know that they weren't living together, per the testimony of the complaining witness. And we—the complainant—the State's evidence is that they had entered into this relationship. They had been friends for many, many years and entered into this relationship just recently.
>
> My client, who is going to testify, has a different version of their relationship, and there is an incident when she's 15—the only sexual contact that they've ever had or even intimate contact that they've ever had kissing, what we would call a romantic contact between the two of them is this one incident when she's 15 and he's about 20. That's it. And we—we need to be able to have her tell the story of their relationship and factually and go into this.

Defense counsel stated that the sexual contact to which she was referring "wasn't consensual."

The State responded in relevant part, "[B]y that dating relationship, there's no requirement

---

[1] In addition to those described above, witnesses testifying for the State during the guilt/innocence phase of trial included the following: (1) Reginald Stern, a "good friend" of Jeffries, testified that he witnessed the incident in question and described what he saw and heard; (2) Jerry Darnell, a used car manager at Americar Auto Sales, testified as to the sale of the Montero involved in the incident in question and stated that his records showed the vehicle was returned after the incident with no mechanical problems; and (3) Officer Carl Barnes of the Dallas Police Department testified that based on his training and experience, a motor vehicle can be a deadly weapon.

that there had to be some kind of sexual or intimate relationship." Further, the State argued that "[w]hat happened when she's 15 . . . is not relevant to this particular case." The trial court ruled that appellant "can testify that she didn't have a dating relationship or sexual relationship," but "can't go into the 15-year-old business."

Appellant testified she is twenty-seven years old. She stated she was convicted of manslaughter in 2003, for which she received ten years' probation. According to appellant, she violated her probation by "not reporting" and subsequently received two years' confinement for that crime. Appellant stated she has known Jeffries since she was in the ninth grade. According to appellant, at the time of the incident in question, she and Jeffries were friends. Appellant stated she has never had any feelings for Jeffries "more than friends." She testified that as an adult, she has never kissed Jeffries, had any sexual contact with him, or been on "an intimate boyfriend/girlfriend date" with him.

Appellant testified she has had epilepsy since she was an infant and suffers from seizures. According to appellant, on June 22, 2009, she stayed up late studying for a test and suffered a seizure that night. She went to school the next day, but left early because she experienced another seizure and did not feel well. When she got home, Jeffries arrived and took her to his house to see her father. Appellant ran several errands with Jeffries. She testified that when they returned to Jeffries's house, she was tired and in pain. She stated that Jeffries did not want her to leave, but finally gave her the keys to the Montero. She and her father got into the car, and she started the car. She testified she put one foot on the gas pedal and one foot on the brake, which is how she always drives.

According to appellant, after she started the car, Jeffries approached the driver's side window, which was open, and tried to reach in to get the keys out of the ignition. Appellant testified Jeffries started hitting her in the face and she put her arm up to defend herself. Appellant stated Jeffries told her to give him back the gas money he had given her. She threw the money out the

−7−

window. She stated she did not see where Jeffries went after she threw the money. She testified she tried to calm herself and shift gears so the car could go backwards. She stated she was looking down. She heard the car "making a zoom sound." Then, she testified, her father hit her on the arm and told her Jeffries "was up under the car." She looked up and saw Jeffries "pinned to the car." She stated she "looked back down again to readjust the car" and "it went back in reverse." She testified she was "frightened and scared and wondering was he hurt."

Appellant stated that after she backed up the car, Jeffries fell over sideways. She testified she got out of the car and asked some people nearby to help her get Jeffries into her car so she could take him to the hospital, but those people would not help her. She stated she began running away from the scene of the incident because she was afraid those people would kill her. Her father ran also. Appellant testified the two of them went to a nearby convenience store and waited inside until police arrived.

On cross-examination, appellant testified as follows with respect to shifting the gears of the Montero:

> A. I caught myself trying to put the car in reverse, but when I noticed it didn't go in reverse, I must have put it in neutral or something. I didn't know for sure because it happened so quick.
>
> Q. So now you said you caught yourself trying to put the car in reverse and you must have put it in neutral, it happened so quick?
>
> A. Yes, ma'am.
>
> Q. And—
>
> A. The reason why I said it because I have a torn ligaments in my hand and I can barely do the pedal, and I use both of my feets [sic] to drive. And when I trying to do it, I think I knocked it out of gear trying to push the brake in, trying to put the car in reverse because it didn't go back in reverse. It went forward. That's how I knew that—when my dad said he was up under the car.
>
> Q. Okay. So you know that you—we looked at the gear shift and, you know, it goes park, reverse, neutral, drive, right?

—8—

A. No, I didn't know that.

Q. You don't know that a gear shift goes park, reverse, neutral, and drive?

A. No.

Additionally, the State published to the jury a written statement appellant gave police on the date of the incident, which included the following:

> [Jeffries] leaned over inside the car and was talking to me, asking what was my problem. I told him I was just tired. Been in school all day. He then reached in the car to get the keys out of the ignition. We were going back and forth. I reached over to shift the gear, but what I did, I smashed the gas pedal and it made the sound, but then he say, give me my fucking money. I told him, fine, it doesn't matter, and threw it at him and he hit me. I told him, why did you hit me. I told you I was tired. We were fighting and tussling and my dad is telling us to stop.
>
> Somehow that gear came back. I knocked it back and shifted back. We were tussling and somehow I was about to put my hand down, the gear went back and then forward. It made a sound and next thing I hear is boom and [Jeffries] is screaming saying, ah. My dad—okay, the next thing I know I hear boom and [Jeffries] is screaming saying, ah. My dad is saying, shift the gear. But I panicked. My feet was on the gas—was on the gas and on the brake pedal trying to shift gears to back up the car from [Jeffries]. I was shifting the gear. He fell over.

Appellant testified that both her statement to police and her testimony at trial were correct.

With respect to her health condition, appellant testified as follows on cross-examination:

Q. And so you're saying this is all based on your seizures—or part of your seizures?

A. Part of my seizures, yes, ma'am.
. . . .
Q. Okay. Mrs. Smith, I'm showing you State's Exhibit 62.

A. Yes, ma'am.

Q. Okay. And when you were—the night of the offense, you came to Dallas County Jail?

A. Yes, ma'am.

Q. Okay. And you were booked in?

A. Yes, ma'am.

Q. And do you remember meeting with a nurse or a medical person and they asked you several questions?

—9—

A. Yes, ma'am.

Q. Okay. And one of the questions that they asked you was do you currently have any medical or psychiatric conditions like seizures, correct?

A. Yes, ma'am.

Q. And you told them none, correct?

A. I don't remember not telling them I had none, because I always tell them. They already have it in the computer.

Q. Okay. But you signed your name to the sheet of paper?

A. Yes, ma'am.

Q. And do you remember being asked these questions, if you want to look over them.

A. Yes.

Q. And so this is a fair and accurate copy of what they asked you and you signed your signature to?

A. Yes, ma'am.

Then, State's Exhibit 62, a jail record titled "Central Intake Health Screening," was offered by the State and admitted into evidence over objections by appellant on the grounds of hearsay and relevance. The jail record stated in part "Do you currently have any medical or psychiatric conditions:" and listed a number of conditions, including "Seizure," next to boxes. The only box checked on the record signed by appellant was next to the word "None." After the jail record was admitted into evidence, appellant testified that at the time she was booked into jail, she did not inform jail medical personnel that she had seizures and did not tell them she had experienced a seizure earlier that day.

Additionally, appellant testified during cross-examination that she made two phone calls to Jeffries during the time she was "incarcerated" after the incident in question. Audio recordings of those calls were published for the jury. Appellant testified that during one of those calls, she "brought up" and "talked about" having sex. Further, appellant testified that during that call she told

–10–

Jeffries "I love you" several times. At the conclusion of appellant's testimony, outside the presence of the jury, defense counsel made a "bill" that included the following testimony of appellant respecting that phone conversation:

> Q. [by defense counsel] On the audio, what did you say about something that happened between you and [Jeffries] on the couch?
>
> A. Do you remember what happened on the couch?
>
> Q. Can you speak up into this microphone, please?
>
> A. Do you remember what happened on the couch?
>
> Q. And what were you referring to in that incident?
>
> A. Him giving me oral sex.
>
> Q. How old were you at that time?
>
> A. Fifteen.
>
> Q. And was that the only incident that—the only sexual interaction you've ever had with [Jeffries]?
>
> A. Yes, ma'am.

The trial court denied appellant's offer of proof as to that testimony.

Dr. Kristi Compton testified she is a clinical and forensic psychologist. With respect to her qualifications, Compton testified in part

> Q. Now, with regard to psychological testing, we know that there are psychiatrists that treat people for mental illnesses or psychological disorders, and then there are psychologists that do testing. And you've talked about your clinical practice as a clinical psychologist. Tell the jury briefly who's qualified to do psychological testing and who's not.
>
> A. Only psychologists have extensive training in testing and interpretation of testing. Psychiatrists have more training in the biological foundations of medications that work on psychiatric disorders.

Compton stated she performed approximately six and one-half hours of psychological testing of appellant pertaining to "neurocognitive abilities or deficits." Compton testified the tests she

administered to appellant included, in part, a "Test of Memory Malingering," which a person would fail only if they are "faking." Compton stated appellant "obtained a perfect score" on that test. Additionally, according to Compton, the testing showed "broad-based neurocognitive deficits in all areas." Compton testified that, with respect to the incident in question, appellant told her that following a seizure and a verbal altercation with Jeffries, "[s]he became confused between the gas and the brake and the gear shift and accidentally went forward and hit him." Compton testified that in her opinion, appellant's explanation of what happened is "plausible."

On cross-examination by the State, Compton testified in part that the records she looked at in making her assessment included "Dr. Pittman's competency examination." On "re-direct" examination by defense counsel, Compton testified that in her opinion, the fact that appellant described multiple versions of what happened did not, in itself, mean appellant was "being overtly or willfully deceitful" because memory "transforms over time." Then, the State conducted a "re-cross" of Compton. Over defense counsel's objection as to violation of privilege, Compton testified she is familiar with Dr. Michael Pittman, a court-appointed psychiatrist who performed a pretrial competency evaluation of appellant. The State asked Compton, "Would it surprise you that Dr. Pittman . . . didn't find [appellant] to be credible in her assessment as to not knowing what had happened and things of that nature?" Compton responded, "Yes, I've read his report." Further, Compton testified as follows:

Q. . . . And basically [Pittman's] assessment is that [appellant] was claiming ignorance, not only for her actions, but any kind of surrounding—surrounding things that were taking place at the alleged offense?

A. That's right. That's his assessment.

Q. Okay. And basically the same information that—or I guess the same Shakeidria Smith that you evaluated is the same Shakeidria Smith that Dr. Pittman also evaluated; is that correct?

A. The same person, yes, I would think so.

Q. Okay. And Dr. Pittman, a forensic and general psychiatrist, he would undergo the same training that you would also undergo as far as medical training, licensing, and things of that nature?

A. Except he wouldn't have training in the testing, yes.

Following the State's "re-cross," defense counsel indicated she desired further direct examination of Compton. Specifically, defense counsel stated

[W]hat I would like—what I would like to go into is that we are talking about apples and oranges. With regard to what Dr. Pittman evaluated [appellant] for is completely different than what Dr.—I mean, Dr. Pittman's evaluation was a competency evaluation, which is completely separate than what [Compton] was—had done.

The trial court denied defense counsel's request for further direct examination of Compton.

The defense rested its case.[2] During the charge conference, the defense requested that the jury be instructed as to "a mistake of fact defense." Defense counsel argued

We believe that given the totality of the circumstances and what was going on at the time that [appellant] was trying to leave the location, that the complainant was trying to refrain her from leaving, trying to take the keys from her, trying to keep her from doing something that she was legally entitled to do, that she—given the totality of those circumstances, that it was reasonable that she would mistakenly attempt to reverse and instead go forward, given the totality of these circumstances and that there was not an opportunity for her to evaluate or determine that she was making a mistake because of the conduct of the complainant at the time, that she was trying to perform a lawful action of leaving the place.

The State responded that appellant "has not necessarily or not successfully raised the mistake of fact defense" because she would have been able to correct her impression of the mistaken fact by simple investigation. Further, the State asserted that appellant's position "doesn't comport with the evidence that was presented by the Defense because if the injuries sustained by the Defendant were in line with that argument, [Jeffries] would not have been injured while in front of the car, as opposed on [sic] the side if that were still going on with the gear incident." The trial court denied

---

[2] In addition to those described above, witnesses called by the defense during the guilt/innocence phase of trial included (1) Bill Goodwin, chief investigator and custodian of investigative records for the Dallas County Public Defenders Office, who described photos of the scene of the incident in question and the vehicle involved and (2) Reginald Stern, a witness originally called by the State, who testified he was previously convicted of the felony offense of burglary of a building.

—13—

appellant's request to instruct the jury on mistake of fact.

Additionally, defense counsel stated there was a "bill that we wanted to bring up." Defense counsel referred to appellant's earlier request for further re-direct examination of Compton and stated in part

> I wanted to clarify the objection when I told the Court that we had a privilege and we were not waiving our privilege with regard to getting into Dr. Michael Pittman's evaluation of my client, that is pursuant to Article 46(b). Then the State proceeded to ask hearsay questions about what Dr. Pittman found to be credible with regard to his examination of her with regard to mental competency to stand trial. We never raised any issue in front of this jury about her mental competence to stand trial. It was simply her neurocognitive deficits.
>
> . . . .
>
> [W]e feel like our only options, other than a mistrial at this point, would be for Dr. Compton to have been asked to clarify the distinction between the examination that Dr. Pittman conducted in terms of the length of time, the object, what Dr. Pittman's qualifications are to do that type of thing, that he's a psychiatrist. He could not have done any of the kinds of evaluations that Dr. Compton could do because he's not qualified to do so.
>
> . . . .
>
> The jury is at a situation where they—they are probably terribly confused about who this Dr. Pittman is and he didn't find [appellant] credible, and he did the same type of examination that my client—I mean, that Dr. Compton did, when that's not the case. And so we just wanted to make our bill about the questions that we wanted to ask on redirect to clean that up for the jury.

The trial court denied appellant's request for a mistrial.

After the jury found appellant guilty of aggravated assault with a deadly weapon, the punishment phase of trial commenced. Evidence presented by the State included, in part, the testimony of Josephine Hadnot, a court probation officer employed by the Dallas County Community Supervision and Corrections Department. Hadnot testified appellant was placed on probation for manslaughter in January 2005, but did not successfully complete that probation. The State asked Hadnot what appellant had done to violate her probation, and the following exchange occurred:

> A. She was arrested on or about July the 13th, 2005, by DART police for failure to I.D.
>
> [DEFENSE COUNSEL]: We object. Can we approach?

THE COURT: No. Your objection is overruled.

Q. [by the State] Okay. Go ahead.

[DEFENSE COUNSEL]: Object to her—object to her reading from a document, hearsay. Object to it.

THE COURT: Overruled.

[DEFENSE COUNSEL]: The State has to prove every allegation in terms of criminal activity beyond a reasonable doubt. Object to this.

THE COURT: Overruled.

Subsequent to the jury's assessment of punishment and appellant's sentencing by the trial court, this appeal was timely filed.

## II. ADMISSION OR EXCLUSION OF EVIDENCE

### A. Standard of Review

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Martinez*, 327 S.W.3d at 736; *Casey*, 215 S.W.3d at 879.

Likewise, an abuse of discretion standard applies to the review of a trial court's denial of a motion for mistrial. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004).

Non-constitutional error must be disregarded unless it affects substantial rights. TEX. R. APP. P. 44.2(b). We must examine the record as a whole and have "fair assurance that the error did not influence the jury, or had but a slight effect" to determine that substantial rights are not affected. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001)). Only if we have a "grave doubt that the result of the trial was free

–15–

from the substantial effect of the error" will we reverse a conviction. *Barshaw v. State*, 342 S.W.3d 91, 94 (Tex. Crim. App. 2011). Grave doubt exists when the matter is so evenly balanced that the judge feels "'in virtual equipoise as to the harmlessness of the error.'" *Id.* (quoting *Burnett v. State*, 88 S.W.3d 633, 637–38 (Tex. Crim. App. 2002)).

If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a).

### B. Applicable Law

#### 1. Preservation of Error

"Preservation of error is a systemic requirement on appeal." *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009). If an issue has not been preserved for appeal, the court of appeals should not address the merits of that issue. *Id.*

"In order to preserve an issue for appellate review, a timely and specific objection is required." *Layton v. State*, 280 S.W.3d 235, 238–39 (Tex. Crim. App. 2009) (citing TEX. R. APP. P. 33.1(a)(1)); *accord Martinez v. State*, 91 S.W.3d 331, 335–36 (Tex. Crim. App. 2002) (party complaining on appeal of trial court's admission, exclusion, or suppression of evidence "must, at the earliest opportunity, have done everything necessary to bring to the judge's attention the evidence rule [or statute] in question and its precise and proper application to the evidence in question"); *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002) (holding that failure to object in timely and specific manner during trial forfeits complaints about admissibility of evidence). A specific objection is necessary to inform the trial judge of the issue and basis of the objection, and to allow the judge a chance to rule on the issue at hand. *Layton*, 280 S.W.3d at 239. An objection is timely if it comes at the earliest opportunity or as soon as the ground for objection becomes apparent.

–16–

*Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006); *Moore v. State*, 999 S.W.2d 385, 403 (Tex. Crim. App. 1999). Generally, even constitutional error is forfeited when no proper objection is made. *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008); *Saldano*, 70 S.W.3d at 889; *see Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004) (finding Confrontation Clause argument not preserved because of failure to object on that ground in trial court); *see also Reyna v. State*, 168 S.W.3d 173, 176–77 (Tex. Crim. App. 2005) (applying error preservation requirement with regard to Confrontation Clause argument). Further, where an appellant's trial objection does not comport with the issue raised on appeal, the appellant has failed to preserve his complaint for appellate review. *Gallo v. State*, 239 S.W.3d 757, 768 (Tex. Crim. App. 2007); *Swain v. State*, 181 S.W.3d 359, 367 (Tex. Crim. App. 2005); *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004).

In order to preserve error regarding a trial court's decision to exclude evidence, the complaining party must comply with Texas Rule of Evidence 103. *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009). Rule 103 provides in relevant part that error may not be predicated upon a ruling that excludes evidence unless "the substance of the evidence was made known to the court by offer, or was apparent from the context within which questions were asked." TEX. R. EVID. 103(a)(2). "The offering party shall, as soon as practicable, but before the court's charge is read to the jury, be allowed to make, in the absence of the jury, its offer of proof." TEX. R. EVID. 103(b). The offer of proof may consist of a concise statement by counsel, or it may be in question-and-answer form. *Mays*, 285 S.W.3d at 889. If in the form of a statement, the proffer "must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible." *Id.* at 889–90 (quoting *Warner v. State*, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998)).

## 2. Witness Interrogation

Pursuant to Texas Rule of Evidence 611, "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." TEX. R. EVID. 611.

Texas Rule of Evidence 613(a) provides in part

In examining a witness concerning a prior inconsistent statement made by the witness, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may be allowed, the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be afforded an opportunity to explain or deny such statement. . . . If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted.

TEX. R. EVID. 613(a).

## 3. Hearsay

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay statements are inadmissible except as provided by statute or other rule. TEX. R. EVID. 802.

## 4. Mistrial

A mistrial is appropriate only when the trial court is faced with error so prejudicial that any expenditure of further time and expense would be wasteful and futile. *See Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *accord Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). To determine whether the facts of a case merit a mistrial, we balance three factors: (1) the severity of the misconduct and its prejudicial effect, (2) curative measures taken by the court, and (3) the certainty of the punishment

assessed absent the misconduct. *Hawkins*, 135 S.W.3d at 77. Ordinarily, a prompt instruction to disregard will cure any prejudice associated with an improper question and answer. *See Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). Appellate courts "generally presume the jury followed the trial court's instructions in the manner presented." *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *accord Wesbrook v. State*, 29 S.W.3d 103, 116 (Tex. Crim. App. 2000). "The presumption is refutable, but the appellant must rebut the presumption by pointing to evidence the jury failed to follow the trial court's instructions." *Thrift*, 176 S.W.3d at 224.

### 5. Admissibility of Competency Evidence

Article 46B.007 of the Texas Code of Criminal Procedure provides in relevant part

> A statement made by a defendant during an examination or trial on the defendant's incompetency, the testimony of an expert based on that statement, and evidence obtained as a result of that statement may not be admitted in evidence against the defendant in any criminal proceeding other than at:
>
> 1) a trial on the defendant's incompetency; or
>
> 2) any proceeding at which the defendant first introduces into evidence a statement, testimony, or evidence described by this article.

TEX. CODE CRIM. PROC. ANN. art. 46B.007 (West 2006). Generally, the erroneous admission of statements made by a defendant during a competency evaluation cannot be waived by a failure to object. *See Perry v. State*, 703 S.W.2d 668, 671 (Tex. Crim. App. 1986).

### C. Analysis

#### 1. Full and Fair Cross-Examination of Complainant

In her first issue, appellant contends the trial court erred by not allowing her full and fair cross-examination of Jeffries. Specifically, appellant asserts she should have been able to question Jeffries about statements he made to probation officers regarding his marital status and whether he has children. According to appellant, her cross-examination of Jeffries was "clearly an attempt to demonstrate 1) that Jeffries had lied to the probation department regarding matters that were testified

to on direct examination, and 2) that Jeffries held a possible motive, bias or interest to testify for the State." Appellant contends the trial court denied her the ability to effectively confront and cross-examine Jeffries in violation of the Sixth and Fourteenth Amendments to the United States Constitution, Article 1 of the Texas Constitution, and Texas Rule of Evidence 613.

The State responds that appellant's first issue was not preserved for appellate review. Additionally, the State contends any alleged error was harmless.

We begin by addressing whether appellant preserved the issue she asserts on appeal. During a break in Jeffries's testimony, outside the presence of the jury, defense counsel made statements to the trial court that she refers to on appeal as "an informal bill of exception or offer of proof." In that offer of proof, which is set out in its entirety above, defense counsel told the trial court she sought to impeach Jeffries by showing that the information in his probation records differed from his testimony in court. On appeal, appellant contends such offer of proof was sufficient to preserve error as to her first issue. However, assuming without deciding that appellant's offer of proof was timely, we cannot agree with appellant as to the scope of the error preserved.

First, appellant argues on appeal that "[t]he potential of the State's forgiveness of [Jeffries's] untruthfulness to the probation department could show bias to testify in favor of the State." Appellant contends she sought the disputed cross-examination to show such bias. However, the record does not show appellant asserted that rationale in the trial court. Thus, to the extent appellant contends the trial court restricted her attempt to demonstrate that Jeffries "held a possible motive, bias or interest to testify for the State," that portion of appellant's first issue has not been preserved for this Court's review. *See Gallo*, 239 S.W.3d at 768 (where appellant's trial objection does not comport with issue raised on appeal, appellant has failed to preserve his complaint for appellate review); *accord Swain*, 181 S.W.3d at 367; *Heidelberg*, 144 S.W.3d at 537.

Second, with respect to appellant's constitutional complaints on appeal, she did not make any

–20–

mention of constitutional provisions in her offer of proof. Therefore, appellant's offer of proof was not sufficiently specific to preserve error on constitutional grounds. *See Reyna*, 168 S.W.3d at 179 (where defendant told trial judge that purpose of excluded evidence was to attack victim's credibility, but asserted no constitutional basis, error was not preserved on Confrontation Clause grounds).

Appellant's remaining argument under her first issue is based on Texas Rule of Evidence 613(a), which, as described above, provides guidelines for examining a witness concerning a prior inconsistent oral or written statement. TEX. R. EVID. 613(a). Appellant contends she was "attempting to tell the complaining witness the contents of such inconsistent statement to afford the witness an opportunity to explain or deny such a statement, as dictated by Rule 613(a) but was stymied by the trial court's ruling." However, even assuming without deciding that the trial court erred by not allowing appellant to fulfill the requirements of Rule 613(a), we cannot conclude such error affected appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). The record shows that prior to the State's objections to appellant's cross-examination, Jeffries had (1) unequivocally admitted he lied about never being married and (2) explained that he told his probation officer about his girlfriend's children and the possibility that he had fathered a child. Thus, appellant's stated objective of showing that Jeffries's testimony was inconsistent with his probation reports was not prevented by the trial court's ruling. On this record, we conclude the trial court made no reversible error respecting the limitation of appellant's cross-examination of Jeffries. *See id.*; *Motilla*, 78 S.W.3d at 355 (appellant's substantial rights not affected where record demonstrates error "did not influence the jury, or had but a slight effect").

We decide against appellant on her first issue.

## 2. Denial of Request for Re-Direct Examination

In her second issue, appellant asserts the trial court erred when it allowed the State to cross-

examine Compton on an issue on "re-cross," but did not allow appellant to conduct "re-direct" examination of Compton on that same issue. Specifically, appellant argues that on "re-cross," the State questioned Compton for the first time respecting Pittman's competency report, and appellant was then "denied the ability to re-direct [Compton] regarding the hearsay statements elicited by the State" as to Pittman's report. According to appellant, "[w]hile the trial court has a wide latitude in the progression of the trial, fundamental fairness demands that, when the State chooses to bring up a topic in their re-cross of one of appellant's witnesses, appellant has a right to re-direct that witness." Appellant contends she was "denied her right to a fair trial and effective assistance of counsel guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Article 1, section 10 and 15 of the Texas Constitution." Additionally, appellant asserts her "bill" on this matter preserved this issue for appellate review.

The State responds that appellant's "bill" is inadequate to preserve the error alleged. Further, the State argues "[a]ny additional testimony on redirect examination from Appellant's expert witness contrasting her qualifications with another expert to give an opinion about the plausibility of Appellant's versions of what happened was cumulative and a waste of time."

The record shows appellant's objections and "bill" did not include any mention of constitutional rights or any related legal ground or theory to support her request for further redirect examination of Compton. Therefore, to the extent appellant asserts constitutional complaints in her second issue, her offer of proof was not sufficiently specific to preserve error on constitutional grounds. *See Reyna*, 168 S.W.3d at 179.

Assuming without deciding that appellant's "bill" preserved her remaining arguments, we cannot agree with appellant that the trial court erred by not allowing further direct examination of Compton. Pursuant to rule of evidence 611, the trial court "shall exercise reasonable control" over the mode of interrogating witnesses and presenting evidence so as to "avoid needless consumption

–22–

of time." TEX. R. EVID. 611. Defense counsel stated in her "bill" that she sought further direct examination to "clarify" distinctions between the qualifications and evaluations of Compton and Pittman. However, the record shows the jury heard testimony that Pittman evaluated appellant and provided a competency report. Additionally, Compton testified (1) her testing of appellant pertained to "neurocognitive abilities or deficits" and (2) Pittman did not have the same training that she had respecting testing. Therefore, the distinctions in question were already before the jury and the testimony sought by appellant would have been cumulative. We conclude the trial court did not err by excluding that testimony. *See id.*

We decide appellant's second issue against her.

### 3. Admission of Competency Evidence

In her third issue, appellant asserts the trial court erred when it "allowed into evidence during her trial oral statements made by defendant during an examination of the defendant's competency by Dr. Michael Pittman." However, appellant does not explain, and the record does not show, what "oral statements made by defendant during an examination of the defendant's competency" were allowed into evidence at trial. Rather, in her argument pertaining to this issue, appellant states, "In the instant case, it is not the appellant's statements that the State put into evidence, but the opinion testimony of the expert based on that statement; that, as well, is protected by [code of criminal procedure art. 46B.007] and prohibited from being admitted in the trial on the merits of appellant." According to appellant,

> The impact of the evidence elicited from Dr. Compton reciting Dr. Pittman's opinions in the competency evaluation during her cross-examination is palpable. . . . [O]ther than Dr. Pittman's opinion of appellant's statements during the competency evaluation, there was little other evidence to support the State's theory that she was malingering, being dishonest, or feigning confusion as to what happened during the offense to avoid a guilty verdict. Dr. Pittman's statement was the strongest evidence supporting the State's theory. The State used appellant's own witness to introduce Pittman's opinion into evidence and the trial court was complicit in the unlawful admission of this evidence.

–23–

The State responds that "[a]ny statement Appellant made to Pittman was not directly alluded to in Compton's testimony." Further, the State asserts "[i]f this Court finds error in the admission of Dr. Pittman's opinion based on Appellant's statements, it was certainly harmless."

Article 46B.007 specifically addresses the exclusion of three types of evidence: (1) "a statement made by a defendant during an examination or trial on the defendant's incompetency," (2) "the testimony of an expert based on that statement," and (3) "evidence obtained as a result of that statement." TEX. CODE CRIM. PROC. ANN. art. 46B.007. As described above, appellant asserts article 46B.007 was violated when the State put into evidence "the opinion testimony of the expert based on [appellant's] statement." We construe appellant's argument to be that Pittman's "opinion of appellant's statements" constituted "testimony of an expert based on that statement" pursuant to article 46B.007, and thus the trial court erred by allowing the State to "use[] appellant's own witness to introduce Pittman's opinion into evidence."

In support of her position, appellant cites *Mitten v. State*, 228 S.W.3d 693 (Tex. App.—Corpus Christi 2005, pet. dism'd). However, *Mitten* involved a statement made by the defendant at his competency hearing that was introduced through the trial testimony of three different expert witnesses, including the doctor who had performed the competency evaluation. *Id.* at 699–700. In the case before us, appellant acknowledges "it is not the appellant's statements that the State put into evidence." Further, the record shows Pittman was not called as a witness at trial and his competency report was not offered or admitted into evidence during the guilt/innocence phase. Therefore, *Mitten* is distinguishable on its facts. "Testimony" has been defined as "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition." BLACK'S LAW DICTIONARY 1514 (8th ed. 2004). Appellant does not explain, and the record does not show, how Compton's statements "reciting" Pittman's opinion constituted "testimony" of Pittman. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.007.

—24—

Moreover, article 46B.007 provides that the three types of evidence listed above are admissible at "any proceeding at which the defendant first introduces into evidence a statement, testimony, or evidence described by this article." *See id.* During the State's initial cross-examination, Compton testified in part that the records she looked at in connection with her assessment included "Dr. Pittman's competency examination." Therefore, we conclude that at the time of the "re-cross" testimony in dispute, appellant had already introduced testimony by Compton that constituted "the testimony of an expert based on [appellant's] statement" and the restrictions of article 46B.007 were inapplicable. *See id.*

We decide against appellant on her third issue.

### 4. Failure to Conduct Preliminary Hearing as to Extraneous Offenses

In her fifth issue, appellant contends the trial court erred when it allowed the State to present evidence of extraneous offenses during the punishment phase of trial "without conducting a preliminary hearing to determine whether the State could prove the extraneous offenses beyond a reasonable doubt." According to appellant,

> During the punishment phase, the State may offer evidence as to any matter the court deems relevant to sentencing, including evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt to have been committed by the defendant or for which he could be held criminally responsible. When presented with an appropriate objection, the trial court has the responsibility to determine the threshold issue of whether an extraneous offense is relevant.

(citations omitted). Appellant complains the trial court erred by not holding a hearing to "determine the threshold issue of relevancy" respecting Hadnot's testimony as to alleged criminal offenses committed by appellant while on a prior probation.

The State responds, in part, that the error asserted by appellant was not preserved for appellate review.

The record shows that during the punishment phase of trial, Hadnot testified appellant was placed on probation for manslaughter in January 2005, but did not successfully complete that

probation. When the State asked Hadnot what probation violations appellant committed, appellant objected to Hadnot's answers by stating (1) "We object."; (2) "Object to her—object to her reading from a document, hearsay. Object to it."; and (3) "The State has to prove every allegation in terms of criminal activity beyond a reasonable doubt. Object to this." The record does not show a request by appellant for a hearing to determine relevancy. We conclude appellant's objections, which were based on hearsay and the State's burden of proof as to extraneous offenses, did not preserve her complaint that the trial court erred by failing to conduct a relevancy hearing. *See Layton*, 280 S.W.3d at 238–39 ("In order to preserve an issue for appellate review, a timely and specific objection is required."); TEX. R. APP. P. 33.1(a)(1); *see also Gallo*, 239 S.W.3d at 768 (where appellant's trial objection does not comport with issue raised on appeal, appellant has failed to preserve his complaint for appellate review); *accord Swain*, 181 S.W.3d at 367; *Heidelberg*, 144 S.W.3d at 537.

We decide appellant's fifth issue against her.

### 5. Admission of Jail Record

In her sixth issue, appellant contends the trial court erred when it admitted into evidence her "jail book-in card," i.e., the "Central Intake Health Screening" record signed by appellant at the time she was booked into jail on the date of the incident in question. Specifically, appellant asserts

> The State did not call to testify the person who filled out the jail book-in form, the custodian of records for the Dallas County Jail, or any other person who could verify that it was a business record for the Dallas County Jail or that the record was kept in the normal course of business of the Dallas County Jail, as required by Texas Rule of Evidence 803(6) before the record can be admitted into evidence as a Record of Regularly-Conducted Activity, an exception to the hearsay rule codified in Rule 802 of the Texas Rules of Evidence.

According to appellant, "[t]he State was offering the record as evidence proving the truth of the matter asserted, that being that the appellant did not tell the clerk taking down the information that she suffered from epileptic seizures." Appellant contends she "denied this," and the State "used the inadmissible hearsay as evidence that she either did not mention the condition to the jail personnel

–26–

or was lying about her health condition."

The State responds that the provisions of Texas Rule of Evidence 613(a) were followed and there was no error by the trial court. Additionally, the State contends the evidence in question did not constitute hearsay because it was not offered for the truth of the matter asserted.

"In the absence of an applicable hearsay exception, an inconsistent statement may be used to impeach the witness's credibility, but cannot be used as primary evidence to prove guilt." *See Flores v. State*, 48 S.W.3d 397, 404 (Tex. App.—Waco 2001, pet. ref'd). "When a prior statement is not offered as primary evidence, but to impeach the witness's credibility, it is not hearsay." *Baldree v. State*, 248 S.W.3d 224, 231 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (citing *Flores*, 48 S.W.3d at 404).

As described above, appellant testified she had a seizure condition that influenced her actions on the date of the incident in question. On cross-examination, appellant was shown the jail record in dispute. Appellant acknowledged that at the time she was booked into jail following the incident in question, she was asked by jail personnel whether she currently had "any medical or psychiatric conditions like seizures." The State asked appellant, "And you told them none, correct?" Appellant testified, "I don't remember not telling them I had none, because I always tell them. They already have it in the computer." Then, the jail record was admitted into evidence over appellant's objection. Immediately thereafter, appellant testified that at the time she was booked into jail, she did not inform jail medical personnel that she had seizures and did not tell them she had experienced a seizure earlier that day.

Accordingly, the record shows that prior to the admission of the jail record into evidence, appellant was told the contents of the alleged inconsistent statement in the jail record, the person to whom it was made, and the time and place it was made. *See* TEX. R. EVID. 613(a). Further, appellant was given an opportunity to explain or deny the inconsistent statement in question and did

not "unequivocally admit[]" having made such statement. *See id.* Finally, the record shows the inconsistent statement in question was being used to impeach appellant's denial that she failed to tell jail medical personnel about her seizures, and not "as primary evidence to prove guilt." *See Flores v. State*, 48 S.W.3d 397, 404 (Tex. App.—Waco 2001, pet. ref'd). On this record, we conclude the trial court did not err when it admitted the "jail book-in card" into evidence.

We decide against appellant on her sixth issue.

### 6. Denial of Mistrial After Admission of Hearsay Statement

In her seventh issue, appellant asserts the trial court erred when it "denied appellant's motion for mistrial when the State intentionally elicited from a witness an inflammatory inadmissible hearsay statement of appellant's father." Specifically, appellant complains as to the State's direct examination of Moore respecting Moore's encounter with appellant's father at police headquarters, which is described above. Appellant argues "[t]he State's question, '[D]o you know who he was upset at or what he was upset about?' was clearly designed for the witness to testify as to what Appellant's father told the officer," which would constitute hearsay. Further, appellant asserts that after the trial court's denial of her motion for mistrial, the State "again sought to circumvent the protections of the hearsay rule." Appellant contends that "[s]ince the protections of the objection, the trial court's sustaining of the objection, [and] the instruction to disregard did not adequately clean the record of the taint of the prosecution's repeated intentional interjection of this hearsay remark, harm is evident under Rule 44.2 of the Texas Rules of Appellate Procedure."

The State responds, in part, that the trial court "promptly instructed the jury to disregard" and this Court "should hold that any error was cured by the court's instruction."

The complained of questions asked by the State after the trial court's denial of the motion for mistrial were as follows:

> Q. [by the State] Without going into what he said, did he make any statements to you?

—28—

A. Yes.

Q. And were those statements regarding what he was upset about?

A. Yes.

We cannot agree with appellant that those questions constituted an attempt to elicit hearsay. *See* TEX. R. EVID. 801(d) (hearsay is statement, other than one made by declarant while testifying at trial, offered to prove truth of matter asserted). Further, appellant does not explain or address why the alleged harm from the State's questions prior to the motion for mistrial was not cured by the trial court's instruction to disregard. *See Thrift*, 176 S.W.3d at 224 (appellate courts "generally presume the jury followed the trial court's instructions in the manner presented" and appellant must rebut presumption by pointing to evidence jury failed to follow trial court's instructions); *Ovalle*, 13 S.W.3d at 783 (prompt instruction to disregard will ordinarily cure any prejudice associated with improper question and answer). We conclude the trial court did not err by denying appellant's motion for mistrial. *See Thrift*, 176 S.W.3d at 224; *Ovalle*, 13 S.W.3d at 783.

We decide against appellant on her seventh issue.

7. Testimony Regarding Prior Sexual Contact Between Complainant and Appellant

In her eighth issue, appellant contends the trial court erred when it excluded her testimony regarding "prior unlawful sexual contact" between her and Jeffries. Appellant argues "[t]he jury was unable to use this evidence to judge the credibility of the complaining witness, to determine whether or not a dating relationship existed between the appellant and the complaining witness, or to establish the relationship between the parties." According to appellant, "[t]he evidence was relevant to each of those issues." Appellant asserts that as a result of the trial court's exclusion of the evidence in dispute, she was "denied her right to confrontation and effective representation of counsel under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Article I, section 10 and 15 of the Texas Constitution."

–29–

The State contends appellant's allegation that Jeffries had unlawful sexual contact with her thirteen years prior to the offense was irrelevant to disproving the allegation of a dating relationship and could not be used to impeach Jeffries's credibility.

The record does not show appellant raised her constitutional complaints in the trial court. Therefore, we conclude those complaints were not preserved for this Court's review. *See Fuller*, 253 S.W.3d at 232; *Saldano*, 70 S.W.3d at 889; *Paredes*, 129 S.W.3d at 535. Appellant's remaining arguments pertain to relevancy and "judgment" of Jeffries's credibility. We address those arguments in turn.

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX. R. EVID. 401. Under the section of the Texas Family Code applicable to the charges in the indictment in this case, "dating relationship" is defined as "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature." TEX. FAM. CODE ANN. § 71.0021(b). The existence of such a relationship shall be determined based on consideration of (1) the length of the relationship, (2) the nature of the relationship, and (3) the frequency and type of interaction between the persons involved in the relationship. *Id.*

The record shows the indictment alleged, in part, that appellant "has and has had a dating relationship with the said complainant." Jeffries testified he and appellant were dating at the time he was injured. Appellant testified they were not dating, but rather were "friends." Further, appellant testified that during a phone call she made to Jeffries after he was injured, she told him "I love you" several times. On this record, we cannot agree with appellant that evidence of an alleged instance of unlawful sexual contact thirteen years ago was relevant to showing appellant and Jeffries did not have a "dating relationship" pursuant to section 71.0021(b) at the time of the incident in

–30–

question. *See* TEX. FAM. CODE ANN. § 71.0021(b); TEX. R. EVID. 401.

As to "judgment" of Jeffries's credibility, Texas Rule of Evidence 608(b) states "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence." TEX. R. EVID. 608(b). Accordingly, the trial court did not err by excluding the evidence in dispute for impeachment of Jeffries's credibility. *See id.*

We decide appellant's eighth issue against her.

## III. REFUSAL TO INSTRUCT JURY ON MISTAKE OF FACT

### A. Standard of Review and Applicable Law

We review the trial court's denial of a requested jury instruction for an abuse of discretion. *See Wesbrook*, 29 S.W.3d at 122; *Garza v. State*, 298 S.W.3d 837, 843 (Tex. App.—Amarillo 2009, no pet.); *Love v. State*, 199 S.W.3d 447, 455 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). In analyzing a jury-charge issue, we first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)). If error is found, we then determine whether the error caused sufficient harm to warrant reversal. *Id.*

A defendant is entitled to an instruction on every defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or uncontradicted, and regardless of what the trial court may think about the credibility of the defense. *Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008). A trial court may refuse an instruction on a defensive theory if the issue was not raised by the evidence. *See Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007); *Garza v. State*, 829 S.W.2d 291, 294 (Tex. App.—Dallas 1992, pet. ref'd); *see also* TEX. PENAL CODE ANN. § 2.03(c) (West 2011) (defensive jury instruction not submitted to jury unless "evidence [was]

–31–

admitted supporting the defense"). A defense is supported or raised by the evidence "if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw*, 243 S.W.3d at 657–58. The defendant bears the burden of showing some evidence exists to support each element of the defense. *Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010); *Shaw*, 243 S.W.3d at 657–58. The evidence is viewed in the light most favorable to the defendant's requested submission. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

Section 8.02(a) of the Texas Penal Code provides "[i]t is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." TEX. PENAL CODE ANN. § 8.02(a). The penal code defines "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

Where the alleged mistaken fact is a matter that is readily discernable by a simple empirical method of investigation that is universally accepted, a mistake of fact defense is not raised by the accused's failure to properly utilize that method. *King v. State*, 919 S.W.2d 819, 821 (Tex. App.—El Paso 1996, no pet.); *Thibodeaux v. State*, 726 S.W.2d 601, 604 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd); *Miller v. State*, 666 S.W.2d 564, 566 (Tex. App.—Houston [14th Dist.] 1984, no pet.).

### B. Analysis

In her fourth issue, appellant contends the trial court erred when it refused to instruct the jury on mistake of fact. According to appellant, "[t]he jury could have believed that appellant reasonably believed that she did, in fact, have the car in reverse when she pressed on the gas, thus establishing a mistake in fact defense."

The State responds that the defense of mistake of fact was not raised in this case. The State

asserts "[a]ppellant's alleged mistake of fact (i.e., believing she put the car in reverse) would have been easily discernable by the simple empirical method of taking a moment to look at the gear shift panel."

The record shows appellant testified (1) Jeffries reached into the car to try to try to grab the keys from the ignition and also hit her in the face; (2) she did not see where Jeffries went after she threw the money out the window; (3) she tried to calm herself and looked down to shift gears; (4) she was "trying" to put the car in reverse, but "must have put it in neutral or something"; and (5) she didn't know the gear shift "goes park, reverse, neutral, and drive."

In order to avail herself of the defense of mistake of fact, appellant must have formed a "reasonable" belief about a matter of fact. *See* TEX. PENAL CODE ANN. §§ 8.02(a), 1.07(a)(42); *Thibodeaux*, 726 S.W.2d at 604. We cannot agree with appellant that her belief that "she did, in fact, have the car in reverse when she pressed on the gas" was reasonable under the circumstances. The fact that Jeffries was in front of the car when appellant "pressed the gas" shows he could not have been interfering with her driving at that time. Further, her alleged mistake of fact would have been easily discernable by the simple empirical method of looking at the gear shift. *See King*, 919 S.W.2d at 821; *Thibodeaux*, 726 S.W.2d at 604; *Miller*, 666 S.W.2d at 566. We conclude a mistake of fact defense was not raised by the evidence in this case. *See King*, 919 S.W.2d at 821; *Thibodeaux*, 726 S.W.2d at 604; *Miller*, 666 S.W.2d at 566. Accordingly, the trial court did not err by not instructing the jury as to mistake of fact. *See Shaw*, 243 S.W.3d at 657–58; *Garza*, 829 S.W.2d at 294; *see also* TEX. PENAL CODE ANN. § 2.03(c).

Appellant's fourth issue is decided against her.

### IV. CUMULATIVE ERROR

In her ninth issue, appellant contends that "if the court finds that the trial court erred in more than one of the points of error argued above but fails to find harm to the defendant from one of the

individual errors, the cumulative effect of the errors harmed her and denied her a fair trial." However, as described in the foregoing analyses, this Court did not conclude "the trial court erred in more than one of the points argued above." Therefore, we decide against appellant on her ninth issue. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("we are aware of no authority holding that non-errors may in their cumulative effect cause error").

## V. CONCLUSION

We decide appellant's nine issues against her. The trial court's judgment is affirmed.

DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2
110965F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SHAKEIDRIA DIANE SMITH, Appellant

No. 05-11-00965-CR     V.

THE STATE OF TEXAS, Appellee

Appeal from the 363rd Judicial District
Court of Dallas County, Texas. (Tr.Ct.No.
F-1000726-W).
Opinion delivered by Justice Lang, Justices
Bridges and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered October 24, 2012.

DOUGLAS S. LANG
JUSTICE